# United States Court of Appeals
## For the First Circuit

02-2159
02-2165
02-2166
02-2188

Vol. I of II

UNITED STATES OF AMERICA,

Appellee,

v.

VINCENT A. CIANCI, JR., FRANK E. CORRENTE, and
RICHARD E. AUTIELLO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Chief U.S. District Judge]

Before

Howard, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

John A. MacFadyen for appellant Vincent A. Cianci, Jr.
Anthony M. Traini for appellant Frank E. Corrente.
Richard C. Bicki with whom Cerilli & Bicki and Edward Gerstein
were on brief for appellant Richard E. Autiello.
Donald C. Lockhart, Assistant United States Attorney with whom
Margaret E. Curran, United States Attorney, Richard W. Rose and
Terrence P. Donnelly, Assistant United States Attorneys were on
brief, for appellee.

August 10, 2004

**STAHL**, **Senior Circuit Judge**. Vincent A. Cianci was the Mayor of Providence, Rhode Island; Frank E. Corrente was the City's Director of Administration; Richard E. Autiello was a member of the Providence City Towing Association, a private organization. Between April 23 and June 24, 2002, the three were jointly tried on a superseding indictment that charged them and others with forty-six violations of federal statutes prohibiting public corruption. The district court entered judgments of acquittal on eight of the charges but submitted the rest to the jury.

On June 24, 2002, the jury returned a total of eight guilty verdicts but acquitted on the remaining thirty counts. All three defendants were convicted on a single count charging a conspiracy to violate the RICO (Racketeer Influenced and Corrupt Organizations) statute. See 18 U.S.C. § 1962(d). Corrente and Autiello were convicted on a count charging a federal bribery conspiracy. See 18 U.S.C. §§ 371 & 666(a)(1)(B). Corrente was convicted on a count charging a substantive RICO violation, see 18 U.S.C. § 1962(c), two counts charging Hobbs Act extortion conspiracies, see 18 U.S.C. § 1951(a), and two counts charging Hobbs Act attempted extortions, see id. Autiello was convicted on an additional count charging a second federal bribery conspiracy. See 18 U.S.C. §§ 371 & 666(a)(1)(B). The jury also answered "YES" to four of thirty-seven special interrogatories, which asked whether the government had "proven" the alleged predicate acts

underlying the racketeering counts; all other special interrogatories were answered "NO" or not answered at all.

The district court subsequently granted a judgment of acquittal on one of the extortion conspiracy charges of which Corrente had been convicted; ordered the forfeiture of $250,000 in a campaign contribution fund controlled by Cianci and Corrente pursuant to RICO's forfeiture provisions, see 18 U.S.C. § 1963(a)(1); and sentenced the defendants to prison terms of sixty-four months (Cianci), sixty-three months (Corrente), and forty-six months (Autiello).

Cianci, Corrente, and Autiello appeal their convictions and sentences, and Cianci and the government cross appeals the district court's forfeiture ruling. We begin with challenges to defendants' RICO convictions.

## I.    The RICO Convictions (All Defendants)

### A.    Indictment

Count One of the indictment charged Cianci, Autiello, and Corrente with conspiracy to operate the affairs of an enterprise consisting of the defendants themselves, the City of Providence, "various officers, agencies and entities of Providence" including thirteen specified agencies, Jere Realty, and Friends of Cianci, and others "known or unknown to the Grand Jury." The purpose of the enterprise "included the following: a. Enriching Defendant Vincent A. Cianci . . . Friends of Cianci through extortion, mail

-3-

fraud, bribery, money laundering, and witness tampering, and b. Through the same means enriching, promoting and protecting the power and assets of the leaders and associates of the enterprise." In a pre-trial motion, defendants moved to dismiss the RICO allegations, asserting that the enterprise as charged was improper in that it was overly broad, vague, and legally impossible.[1] The district court denied the motion. The issues raised by this motion were revisited on motions for judgment of acquittal and for a new trial. The court denied these motions as well.

Defendants argue that the enterprise charged in the indictment was purposefully obscure and did not provide adequate notice to defendants of the crimes for which they were charged and ultimately convicted. The argument is couched in two ways: that 18 U.S.C. § 1961(4) is unconstitutional as applied for failure to provide "fair warning" of the alleged criminal conduct and that the charged enterprise failed to provide adequate notice against which the defendants could defend themselves. The government counters that, under the RICO statute, enterprise is defined broadly and that defendants were sufficiently apprised of the nature and extent of the charges.

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of

---

[1] We address this legal impossibility argument later in the context of whether sufficient evidence supported the charged RICO enterprise.

which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). The statute also outlaws conspiracies to violate § 1962(c). See id. § 1962(d). As stated above, Corrente was convicted of a substantive violation of § 1962(c), and all three defendants were convicted of RICO conspiracy under § 1962(d).

A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). See United States v. DeCologero, 364 F.3d 12, 18 (1st Cir. 2004). It is important to stress that the Supreme Court has admonished that RICO and the term "enterprise" be construed expansively. See United States v. Turkette, 452 U.S. 576, 586-87 (1981); Sedina, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497-98 (1985); see also United States v. London, 66 F.3d 1227, 1243-44 (1st Cir. 1995); United States v. Lee Stoller Enterprises, Inc., 652 F.2d 1313, 1318 (7th Cir. 1981). The term's flexibility is denoted by the use of the word "includes" rather than "means" or "is limited to"; it does not purport to be exhaustive. See United States v. Masters, 924 F.2d 1362, 1366 (7th Cir. 1991) (Posner, J.); United States v. Perholtz, 842 F.2d 343, 353 (D.C. Cir. 1988). Accordingly, "enterprise" has been interpreted inter alia to include (1) legal entities such as

-5-

legitimate business partnerships and corporations, and (2) illegitimate associations-in-fact marked by an ongoing formal or informal organization of individual or legal-entity associates, see London, 66 F.3d at 1243-44 (associations-in-fact may include legal entities such as corporations), who or which function as a continuing organized crime unit "for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 580-83; see also United States v. Patrick, 248 F.3d 11, 19 (1st Cir. 2001), cert. denied, 535 U.S. 910 (2002). The enterprise charged in this case is of the latter, associated-in-fact variety.

Here, the superseding indictment delineated the members of the enterprise, the roles of the defendants in the enterprise, the purposes and goals of the racket, and the ways in which the defendants used other members of the enterprise--specifically, municipal entities that they controlled as part of the conspiracy-- to further those purposes and goals. It alleged that defendants conspired to violate and did in fact violate RICO through their involvement in an associated-in-fact enterprise devoted to enriching and empowering defendants and others through unlawful means. The enterprise was alleged to have been comprised of the individual defendants; the City of Providence "including, but not limited to" many of its departments, offices, and agencies; the campaign contribution fund controlled by Cianci and Corrente; and others known and unknown to the grand jury. The enterprise

allegations, which we reproduce as redacted following the district court's entry of the eight judgments of acquittal prior to the jury charge, read as follows:

### THE RACKETEERING ENTERPRISE

Defendants VINCENT A. CIANCI, JR., a/k/a "Buddy"; FRANK E. CORRENTE; RICHARD E. AUTIELLO; the City of Providence ("Providence"), including, but not limited to, the Office of Mayor, the Office of the Director of Administration, the Providence City Solicitor's Office, the Department of Planning and Development, the Providence Redevelopment Agency, the Tax Collector's Office, the Tax Assessor's Office, the Board of Tax Assessment Review, the Finance Department, the Department of Public Safety, the Providence School Department, the Department of Inspection and Standards, and the Building Board of Review; Friends of Cianci, the political organization of Defendant VINCENT A. CIANCI, JR., a/k/a "Buddy"; and others known and unknown to the Grand Jury, constituted an "enterprise" as defined by 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact. This enterprise, which operated in the District of Rhode Island and elsewhere, was engaged in, and its activities affected interstate commerce.

### PURPOSES OF THE ENTERPRISE

The purposes of the enterprise included the following:

a. Enriching Defendant VINCENT A. CIANCI, JR., a/k/a "Buddy" and Friends of Cianci through extortion, mail fraud, bribery, money laundering, and witness tampering; and

b. Through the same means enriching, promoting, and protecting the power and assets of the leaders and associates of the enterprise.

-7-

<u>DEFENDANTS AND THEIR ROLES IN THE ENTERPRISE</u>

>        Defendants VINCENT A. CIANCI, JR., a/k/a
> "Buddy;" and FRANK E. CORRENTE were the
> leaders of the enterprise . . . .
>
>        Defendant RICHARD E. AUTIELLO, and others
> known and unknown to the Grand Jury, were
> associated with, and conducted and
> participated, directly and indirectly, in the
> conduct of the enterprise's affairs, including
> but not limited to extortion, mail fraud, and
> bribery.

Superseding Redacted Indictment, ¶¶ 38-41.  This enterprise was

alleged to have existed "from in or about January 1991 through in

or about December 1999."

The balance of the indictment (again, in the redacted

form in which it went to the jury) also detailed the "pattern of

racketeering activity" underlying the grand jury's RICO and RICO

conspiracy allegations.  The unlawful conduct comprising the

alleged pattern was set forth in a section detailing the predicate

RICO "Racketeering Acts" and in separate offense counts.  The

pattern was itself subdivided into nine alleged schemes:

>        1.  A scheme, carried out between 1991 and
> late 1999, in which Corrente (with Autiello
> serving as his intermediary) pressured
> companies with whom the Providence Police
> Department contracted for towing services to
> make campaign contributions totaling some
> $250,000 to Friends of Cianci in order to
> remain on the tow list ("the Tow List
> scheme");
>
>        2.  A scheme, carried out between 1991 and
> 1998, in which the owner of Jere Realty, a
> local real estate company, was alleged to have
> paid bribes and kickbacks which made their way

-8-

to Corrente in order to secure a Providence School Department lease for one of the company's Providence buildings ("the Jere Lease scheme");

3. A 1998 scheme in which Cianci was alleged to have been involved in extorting a $10,000 contribution from the estate of Fernando Ronci (which owed the City some $500,000 in back taxes) in exchange for his support in the estate's efforts to secure a tax abatement from the corrupt Board of Tax Assessment Review, which was chaired by co-conspirator Joseph Pannone and vice-chaired by co-conspirator David Ead ("the Ronci Estate scheme");

4. A 1996-97 scheme in which Cianci was alleged to have arranged for Christopher Ise to obtain a job in the City's Department of Planning and Development in return for a $5,000 contribution ("the Ise Job scheme");

5. A 1999 scheme in which Cianci was alleged to have supported the contemplated sale of two City lots to a City vendor, Anthony Freitas, in return for a $10,000 contribution ("the Freitas Lots scheme");

6. A 1998-99 scheme in which Corrente was alleged to have attempted to influence the Providence School Department to encourage a city contractor entitled to reimbursement from the City for its lease expenses to lease a building owned by Anthony Freitas in return for contributions totaling $2,000 ("the Freitas Lease scheme");

7. A 1998 scheme in which Corrente, acting through Joseph Pannone, was alleged to have facilitated prompt payments of invoices submitted to the City by a business owned by Anthony Freitas in return for contributions totaling $1,100 ("the Freitas Invoices scheme");

8. A 1998 scheme in which Cianci was alleged (a) to have attempted to influence the City's

Building Board of Review to deny a request for construction variances made by the private University Club in retaliation for the Club's having refused to admit him as a member back in the 1970s and its continuing refusal to admit him, and (b) to have extorted a free honorary membership from the Club as the construction variance dispute was unfolding ("the University Club scheme"); and

9. A 1996 scheme in which Autiello conspired with an unnamed public official to facilitate the hiring of Joseph Maggiacomo as a Providence police officer in return for a $5,000 cash contribution by Joseph's mother, Mary Maggiacomo ("the Maggiacomo Job scheme").

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendants of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" Id. (citations omitted); see also United States v. McDonough, 959 F.2d 1137, 1140 (1st Cir. 1992).

The indictment not only tracks the language of the RICO statute, but also goes into considerable detail with respect to the underlying factual allegations. Hence, we conclude that defendants were more than sufficiently apprised of the charges.

-10-

B.    Enterprise

The defendants also argue that their RICO convictions cannot stand because there was insufficient evidence to ground the jury's foundational finding that the government had proved the existence of the RICO "enterprise" that the government charged.[2] We begin our analysis by summarizing the relevant legal principles and the government's RICO theory and proof.

In cases involving an alleged associated-in-fact RICO enterprise, the existence of the charged enterprise does not follow, ipso facto, from evidence that those named as the enterprise's associates engaged in crimes that collectively may be characterized as a "pattern of racketeering activity":

> While the proof used to establish these separate elements [i.e., the "enterprise" and the "pattern of racketeering activity"] may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

---

[2]The indictment and the jury instructions required that the government prove the same enterprise, described below, in order to secure convictions on both the substantive RICO count and the RICO conspiracy count. The analysis that follows therefore applies with equal force to the substantive RICO conviction returned against Corrente and to the RICO conspiracy convictions returned against Cianci, Corrente, and Autiello.

<u>Turkette</u>, 452 U.S. at 583.  In other words, criminal actors who jointly engage in criminal conduct that amounts to a pattern of "racketeering activity" do not automatically thereby constitute an association-in-fact RICO enterprise simply by virtue of having engaged in the joint conduct.  Something more must be found -- something that distinguishes RICO enterprises from ad hoc one-time criminal ventures.  <u>See</u> <u>Bachman</u> v. <u>Bear Stearns & Co., Inc.</u>, 178 F.3d 930, 932 (7th Cir. 1999) (Posner, C.J.) (noting that a contrary rule would erroneously make "every conspiracy to commit fraud . . . a RICO [enterprise] and consequently every fraud that requires more than one person to commit . . . a RICO violation").

Courts have divided over the legal standards that guide the drawing of this distinction.  Some require proof that an alleged associated-in-fact enterprise have an "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity . . ., which might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes."  <u>Patrick</u>, 248 F.3d at 18 (quoting <u>United States</u> v. <u>Bledsoe</u>, 674 F.2d 647, 664 (8th Cir. 1982), and discussing cases from other circuits that have adopted <u>Bledsoe</u>'s "ascertainable structure" standard) (internal quotation marks omitted).  Courts following the "ascertainable structure" approach do so out of concern that the factfinder not be

-12-

misled into "collaps[ing] . . . the enterprise element with the separate pattern of racketeering activity element of a RICO offense." Id. (quoting Bledsoe, 674 F.2d at 664) (internal quotation marks omitted).

This circuit has cast its lot with courts that have declined to make Bledsoe's "ascertainable structure" criterion a mandatory component of a district court's jury instructions explaining RICO associated-in-fact enterprises. See id. at 18-19. Instead, we have approved instructions based strictly on Turkette's explanation of how a criminal association might qualify as a RICO enterprise. See, e.g., Patrick, 248 F.3d at 17-19. In doing so, we have read Turkette to impose a requirement that those associated in fact "function as an ongoing unit" and constitute an "ongoing organization." Id. at 19. Also important to such an enterprise is that its members share a "common purpose." See, e.g., id.; Clemente v. Ryan, 901 F.2d 177, 180 (1st Cir. 1990) ("[A]lthough much about the RICO statute is not clear, it is very clear that those who are 'associates' . . . of a criminal enterprise must share a 'common purpose' . . . .") (citations omitted).

We turn now to the particulars of the defendants' argument. First, they contend that the indictment charged a legal impossibility in alleging that municipal entities were themselves part of the unlawful purpose associated-in-fact enterprise. They base this argument on the requirement that members of such an

enterprise share a common unlawful purpose and cases holding that municipalities cannot be found to have acted with unlawful intent. See, e.g., Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 404 (9th Cir. 1991) ("[G]overnment entities are incapable of forming a malicious intent."); United States v. Thompson, 685 F.2d 993, 1001 (6th Cir. 1982) ("Criminal activity is private activity even when it is carried out in a public forum and even though the activity can only be undertaken by an official's use of a state given power[.]").

Defendants' argument misses the mark because neither the indictment nor the jury instructions compel the conclusion that the City itself had to have formed an unlawful intent. It is uncontroversial that corporate entities, including municipal and county ones, can be included within association-in-fact RICO enterprises. See, e.g., London, 66 F.3d at 1244; Masters, 924 F.2d at 1366. It is also beyond dispute, as the Supreme Court held in Turkette, that "the term 'enterprise' as used in RICO encompasses both legitimate and illegitimate enterprises." 452 U.S. at 578. As the D.C. Circuit elucidated:

> [A restrictive] reading of 1961(4) would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO. [Such an] interpretation hardly accords with Congress' remedial purposes: to design RICO as a weapon against the sophisticated racketeer as well as (and perhaps more than) the artless.

-14-

Perholtz, 842 F.2d at 353. Municipal entities can be part of an unlawful purpose association-in-fact enterprise so long as those who control the entities share the purposes of the enterprise. "RICO does not require intentional or 'purposeful' behavior by corporations charged as members of an association-in-fact." United States v. Feldman, 853 F.2d 648, 657 (9th Cir. 1988). A RICO enterprise animated by an illicit common purpose can be comprised of an association-in-fact of municipal entities and human members when the latter exploits the former to carry out that purpose. Cianci, Corrente, and Autiello – those who wielded influence, exerted pressure, and effectively controlled the City's various components – are the criminals here. Defendants' legal impossibility argument holds water only had the government sought prosecution of the City itself. The City and its component agencies are not the defendants in this case; they were deemed members of the enterprise because without them, Cianci, Corrente, and Autiello would not have been able to even attempt to perpetrate the charged racketeering schemes. Indeed, this is not the first time an association-in-fact enterprise composed in this manner has been found to exist. See, e.g., Masters, 924 F.2d at 1362; United States v. McDade, 28 F.3d 283 (3d Cir. 1994) (upholding association-in-fact enterprise consisting of congressman, his two offices, and congressional subcommittees that he chaired); United States v. Dischner, 974 F.2d 1502 (9th Cir. 1992) (upholding

-15-

association-in-fact enterprise consisting of municipal officials, office of mayor, and department of public works); United States v. Angelilli, 660 F.2d 23, 31-33 (2d Cir. 1981) ("We view the language of § 1961(4), . . . as unambiguously encompassing governmental units, . . . and the substance of RICO's provisions demonstrate a clear congressional intent that RICO be interpreted to apply to activities that corrupt public or governmental entities."). In each of these cases, the groupings of individuals and corporate or municipal entities were sufficiently organized and devoted to the alleged illicit purposes that the resulting whole functioned as a continuing unit. The common purpose was dictated by individuals who controlled the corporate or municipal entities' activities and manipulated them to the desired illicit ends.

The indictment and jury instructions are consistent with this framing of the enterprise. The district court instructed the jury, without objection from either party, that "the Government must prove that the alleged enterprise had an ongoing organization, whether it be formal or informal, and that its various associates functioned together as a continuing unit to achieve common goals." The court continued, "It is not necessary in proving the existence of an enterprise to show that each member of the enterprise participated in or even knew of all of its activities, but it is necessary to show that all members of the alleged enterprise shared a common purpose." Requiring the government to prove that all

-16-

members named in the enterprise shared a common purpose of illegality did not compel the government to show that the City itself had the mens rea to seek bribes and to extort. The Ninth and Sixth Circuits articulated what in some sense is the obvious: that a corporate or municipal entity does not have a mind of its own for purposes of RICO. Lancaster Comm. Hosp., 940 F.2d at 404; Thompson, 685 F.2d at 1001. Unlawful common purpose is imputed to the City by way of the individual defendants' control, influence, and manipulation of the City for their illicit ends. Whether the defendants did exercise sufficient control over the City for purposes of the enterprise is one of fact for the jury and evidentiary sufficiency.

It follows that the defendants also have an evidence-based argument. They contend that their RICO convictions must be reversed because the evidence introduced at trial in support of the alleged schemes set forth above -- the only proof from which the jury might have inferred that the schemes were carried out, or were intended to be carried out, by means of a RICO enterprise, see Turkette, 452 U.S. at 583 (observing that proof of the pattern of racketeering activity may in particular cases also constitute the proof of the enterprise itself) -- was insufficient to ground a finding that the schemes were conducted through the specific entity alleged in the indictment to have constituted a RICO enterprise. Defendants base this argument on an assertion that there was no

evidence from which the jury might have inferred a shared purpose between defendants and the municipal entities named as associates of the enterprise and through which many of the schemes were conducted.  In support of this argument, the defendants point to specific statements by the district court that "there is no evidence that the [City] departments and/or agencies, themselves, shared [the enterprise's] purposes," United States v. Cianci, 210 F. Supp. 2d 71, 73 (D. R.I. 2002) (denying defendants' motions for judgments of acquittal), and that "none of [defendants'] acts . . . resulted in any significant disruption of a Governmental function."  Id.  The defendants also emphasize that, even if we were to evaluate the sufficiency of the evidence underlying the RICO convictions by construing the entire record in the light most favorable to the government, the evidence is insufficient.

As set forth above, we have identified Turkette's "ongoing organization," "continuing unit," and "common purpose" requirements as the principal tools a factfinder should use to distinguish a RICO enterprise from an ad hoc criminal confederation.  We have applied these requirements to unlawful purpose associations-in-fact involving corporate legal entities. See London, 66 F.3d at 1243-45.  The district court adequately set out these requirements to the jury; hence, we see no basis for disregarding the court's instructions in the course of our sufficiency review.  See, e.g., United States v. Zanghi, 189 F.3d

-18-

71, 79-80 (1st Cir. 1999) (an unchallenged jury instruction that is faithful to the indictment and "not patently incorrect or internally inconsistent" becomes the standard by which evidentiary sufficiency is to be measured) (citing United States v. Gomes, 969 F.2d 1290, 1294 (1st. Cir. 1992)).

After careful scrutiny of the record and setting the evidence against the jury instructions, we conclude that the jury could have found the above requirements, specifically that the defendants and others named as enterprise members comprised an ongoing organization that functioned as a continuing unit and was animated by common purposes or goals.

We agree with the government's assertion that the jury's enterprise finding is sustainable because there was sufficient evidence that Cianci and Corrente exercised substantial control over the municipal entities named as members of the enterprise. Cianci was the City's mayor and Corrente its chief of administration. They were alleged and were shown to have used their positions and influence to sell municipal favors on a continuing basis. The evidence indicates a close relationship "in fact" among them, the City they managed, and Cianci's political organization. Cianci, as mayor, and Corrente and Autiello, as city officials, were strongly connected to and had considerable influence over the various City employees and departments. Their illegal schemes could function only with the cooperation, witting

or unwitting, of certain City agencies and officials. Insofar as Cianci's and the other defendants' criminal schemes were or would be carried out by themselves and others acting in their municipal roles, the City--if only to that extent--did share in the same common criminal purpose.[3] The defendants were not only human members of the enterprise, but were the City's official leaders with considerable express and implicit authority over its departments and employees. Moreover, the enterprise's corrupt purposes were aimed at exploiting the City's resources. It is because of this control and these close connections that the jury could have imputed the enterprise's common purpose to the City. See Masters, 924 F.2d at 1366 ("Surely if three individuals can

---

[3]The evidence depicted a behavioral spectrum ranging from innocent cooperation to willful complicity in unlawful conduct. For example, with respect to the Freitas Invoices scheme, the evidence was merely that an employee within the City's Finance Department (Lorraine Lisi), acting at Corrente's request, paid valid invoices more promptly than usual. Similarly, with respect to the Ise Job scheme, the evidence was merely that the Deputy Director of the Department of Planning and Development (Thomas Deller) created a temporary position for Ise within the department at Cianci's request. At the more culpable end of the spectrum, however, there was evidence that, in connection with the Jere Lease scheme, the head of the Department of Public Property (Alan Sepe) and the Director of Business Relations for the School Department (Mark Dunham) were influenced by Corrente to tailor the specifications in a School Department lease bid to fit the dimensions of Jere Realty's building, and then to support the Jere Realty lease before the Board of Contract and Supply (which was the entity formally empowered to accept or reject bids of City contracts). Similarly, in connection with the Freitas Lease scheme, there was evidence that Corrente again contacted Dunham prior to finalization of the lease and influenced him to drop consideration of an alternative lease.

-20-

constitute a RICO enterprise, . . ., then the larger association that consists of them plus entities that they control can be a RICO enterprise too.").

Evidence of defendants' control, both titular and actual, was sufficient to deem the enterprise a "continuing unit" and "ongoing organization."  The jury could easily glean from taped conversations and the trial testimony of David Ead –- a co-conspirator and vice-chair of the Board of Tax Assessment Review –- that there existed an organized structure with Cianci at the top, Corrente as a middle man facilitating and often initiating transactions, and others, including Autiello, Ead, and Pannone, that fed deals into the organization (or in Ead's case, sometimes tried to replace Corrente as the middle man).  The defendants attempted to use, to varying degrees of success, various municipal agencies in committing a series of related bribes and extortions. These agencies were used in this manner on an ongoing basis from 1991 through 1999.  The fact that other persons and entities were used in some transactions but not in others does not matter; the jury instructions reflected this flexibility.[4]

_____

[4]The court instructed, in relevant part:

"An enterprise may exist even though individual members come and go as long as it continues in an essentially unchanged form during substantially the entire period alleged in the indictment, . . . ."

"It is not necessary in proving the existence of an enterprise to show that each member of the enterprise participated in or even

-21-

There was detailed evidence, moreover, placing Cianci, the City's mayor, in the middle of at least four of the enumerated racketeering acts. With regard to the Ronci Estate scheme, David Ead testified at trial that he suggested to Ronci's attorney that the estate settle its tax claim with the City for $100,000 in exchange for a $10,000 contribution to the Friends of Cianci. Ead met with Cianci and discussed the proposed deal. The settlement was approved by the City's Board of Tax Assessment Review. Ead testified that shortly thereafter, he was contacted by Corrente, who told him that Cianci wanted Corrente to collect the money. Ead responded that he was waiting for the Ronci attorney, to which Corrente replied, "Well you know that the Mayor he's on my back – do your best." After receiving the money from Ronci's attorney, Ead brought the money to Corrente who put his finger on his lips and took the envelope. A tape-recorded conversation between Joseph Pannone and Anthony Freitas provided additional evidence.[5] Our dissenting brother recognizes that there was enough evidence for

_____

knew of all of its activities, . . . ."

". . . a Defendant need not have been associated with an enterprise for the entire time that the enterprise existed in order to have been associated with the enterprise, but a Defendant must share some common goal or objective of the enterprise in order to be a member."

[5]Pannone said to Freitas, "Ead took care of the Mayor, don't know what he gave the Mayor . . . He took care of me, too. He pushed the Ronci settlement through."

the jury to conclude that defendants functionally controlled the Board of Tax Assessment Review, often for criminal purposes.

With regard to the Ise Job, Ead again testified that he served as a middleman for Mayor Cianci, this time arranging a $5,000 bribe in exchange for a municipal job.  According to Ead, Cianci asked during their conversation about Ise, cautious about whether "he's alright" and looking for assurances that "he's not going to say nothing."  Upon learning that the City's Department of Planning and Development had no positions available, Cianci ordered the Department to "make one."  Upon receiving the $5,000 "contribution," Cianci told Ead, "Don't get nervous."

In their trial testimony, which closely tracked taped conversations among Freitas, Pannone, and other City officials, both Freitas and Ead implicated Cianci in the Freitas Lots scheme, in which Cianci pressured the Providence Redevelopment Authority, the entity empowered to sell the lots, to expedite the sale of two City-owned lots to Freitas in exchange for a $10,000 "contribution" by Freitas to the Cianci political fund.  Finally, with regard to the Tow List scheme, Dorothy Deveraux –- Corrente's assistant and the Friends' bookkeeper –- wrote a note to Corrente which implicated all three defendants in that scheme.[6]  Moreover, as

---

[6]Deveraux's note supported the prosecution theory that when towers occasionally "contributed" too much money under the same name, the defendants arranged for "replacement" checks to be made by third-party straw contributors.  The note read, "FRANK – attached are two over checks – Please sign and Dick Autiello will

Judge Howard concedes, the jury could have found, based primarily on taped statements and the trial testimony of towing association chairman Kenneth Rocha, that Corrente effectively controlled who made it onto the police department's tow list.

We recognize that the defendants did not always get their way with municipal departments and employees.[7]  But the fact that some racketeering schemes did not go as planned, and that certain elements within the City may not have completely complied with the defendants' wishes, does not defeat the integrity of the charged enterprise.  The jury could have concluded that these glitches in the schemes only meant that certain substantive crimes went uncompleted and that otherwise, defendants possessed and exercised considerable control over crucial elements of the City.  The evidence amply establishes a close relationship between defendants and the City in which they exercised their leadership roles.  The

_____

be by today to replace with new checks – I need your help with the other people – these overages total $3,420.00.  I know the Mayor does not want to part with that – without money being replaced. Please assign someone to talk to these people."

[7]For example, in connection with the Freitas Lots scheme, Cianci was displeased that elements within the Providence Redevelopment Agency did not sufficiently accede to his wishes, specifically when the PRA sold one of the "Freitas lots" before Cianci had a chance to finalize a deal with Freitas.  In connection with the University Club scheme, Cianci was displeased when members of the Providence Building Board of Review ignored his wishes and granted the club some of the variances that it sought.  Finally, in connection with the Maggiacomo Job scheme, the Chief of Police declined to admit Maggiacomo to the police academy because he had a criminal history and had been untruthful during a screening interview.

enterprise and the conspiracy still thrived and the defendants were able to complete other schemes through their abuse of the municipal apparatus.

Defendants attempt to expose what they deem an error by the government in charging an overly broad enterprise that places a criminal onus on a largely innocent City. They warn that an enterprise such as that charged here implicates non-culpable municipal parties in associations which they had little or no idea were engaged in illicit activities. But this fear is misplaced. Here, as long as elements within the City, such as the police chief and members of the Building Review Board and Redevelopment Agencies, in fact did not actively share in the defendants' illegal purposes, we see no reason why we run into now-Justice Breyer's admonition in Ryan: that of failing to differentiate between associations that fall within the sweep of RICO and associations involving only the exploitation of others by criminals. See 901 F.2d at 180-81 (emphasizing the need to limit "the potentially boundless scope of the word 'enterprise' so as to distinguish culpable from non-culpable associations, and recognizing "the serious consequences for any man or woman, state official or private person, who is publicly accused of racketeering"); see also Fitzgerald v. Chrysler Corp., 116 F.3d 225, 226-28 (7th Cir.

1997).[8] Justice Breyer's limiting principle of a shared common purpose among members of an association-in-fact enterprise still functions here to prevent a "boundless enterprise." Those employees of a city that do not exhibit the requisite mens rea with regard to the enterprise's illicit purposes will not be criminally or civilly implicated. In the present litigation, the City was named a member of the charged enterprise, not a defendant. The City "shared" in the enterprise's purpose only to the extent of the defendants' considerable influence and control over the relevant municipal agencies, and to the extent of those officials and departments who were wittingly or unwittingly involved in the various schemes. Being named in the enterprise does not make the City itself criminally or civilly liable under RICO.[9] It bears repeating that the RICO statute defines "enterprise" broadly and

---

[8]We distinguish Judge Howard's law firm hypothetical on the same basis by which defendants' criminal purpose is imputed to the City: that defendants, as City officials and leaders, had effective titular and actual control over these municipal agencies. The same presumably cannot be said for the hypothetical Providence law firm.

[9]The definitions of an enterprise in the RICO statute and the jury instructions in no way require an enterprise to include nothing but criminal actors. To the contrary, a legitimate business, exploited by racketeers, may be an enterprise. It is true that members of an association-in-fact enterprise, such as is now charged, must be connected by a common thread of purpose; and one might often expect such a purpose to be of a criminal nature. See Turkette, 452 U.S. at 578. But the ultimate question is whether an association-in-fact exists. For this, it is not required that each participant have a separate mens rea so long as each can reasonably be said to share in the common purpose. The City's role here in the overall plans of the defendants suffices for it be part of the association-in-fact enterprise.

that the Supreme Court has consistently instructed that we read the overall statute expansively.  See Turkette, 452 U.S. at 586-87; Sedina, S.P.R.L., 473 U.S. at 497-98.  A liberal construal of the RICO statute and in particular, the term "enterprise," leads us to the conclusion that the enterprise, as charged, is supported by the evidence.

C.    Pattern of racketeering activity

Defendants also argue that there was insufficient evidence of a pattern of racketeering activity.  For purposes of a RICO conspiracy, the sufficiency questions boils down to whether a jury could have found that the defendants intended to further an endeavor which, if completed, would have satisfied the "pattern" requirement of RICO.  See Salinas v. United States, 522 U.S. 52, 61-66 (1997); United States v. Edwards, 303 F.3d 606, 642 (5th Cir. 2002).  Here, the evidence shows that the endeavor resulted in a series of completed crimes.  Evidence of all nine schemes enumerated in the indictment, including the two that underlie Corrente's substantive RICO conviction, shows a pattern of racketeering activity.

Two or more RICO predicate acts form a "pattern" if they are (1) "related" and (2) "amount to or pose a threat of continued criminal activity."  H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989); Systems Mgmt., Inc. v. Loiselle, 303 F.3d 100, 105 (1st Cir. 2002).

Predicate acts are "related" for RICO purposes if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., Inc., 492 U.S. at 240 (quotation marks omitted). We must bear in mind that "a criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities. Versatility, flexibility, and diversity are not inconsistent with pattern." Masters, 924 F.2d at 1367.

The evidence shows that the defendants, and ultimately Cianci, were the beneficiaries of most if not all of the nine schemes. The jury could have concluded that the schemes were designed to line Cianci's pockets as well as to maintain his political power in the City. As for methods, most of the schemes involved either Cianci or Corrente calling or personally meeting with city officials and influencing municipal decision-making either through explicit or implicit orders. As the government points out, important "sub-trends" underlay the schemes. The Jere Realty Lease and the Freitas Lease dealt with the School Department. The Tow List and Maggiacomo Job involved the Police Department. The Ise and Maggiocomo Jobs both involved pawning of municipal jobs. Both the Ronci Estate and Freitas Lots schemes involved extortions for tax abatements. All of the offenses involve trading jobs, contracts, and official acts for money,

-28-

contributions to Cianci's political fund, or other items of value. In most of the schemes, the money was solicited by, paid to, or collected by Corrente.

In addition, the schemes often shared the same players. Corrente, Ead, Pannone, and Autiello were all fundraisers for the Friends of Cianci. Ead participated in the Ronci Estate, the Ise Job, and the Freitas Lots schemes, while Pannone played important roles in the Ronci Estate, the Freitas Lease, and Pay-to-Get-Paid schemes. Autiello was the chief associate in the Tow List extortion and Maggiacomo Job sale. Overall, the evidence shows that the individual racketeering acts were not isolated events but rather parts of a pattern of racketeering activity contemplated and committed by an overarching RICO conspiracy to which all three defendants, along with other co-conspirators, belonged.

"Continuity" of the pattern of racketeering may be shown by either "a series of related predicates extending over a substantial period of time," or a pattern of more limited duration where "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future" or "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." H.J., Inc., 492 U.S. at 242.

Defendants were accused of conducting a RICO conspiracy that lasted nine years. The Tow List scheme spanned approximately the entire period. During this time, Autiello regularly channeled

contributions to Corrente. When towers contributed too much money under the same name, the conspirators scrambled to find other straw contributors, or "replacement" contributors.

The Jere Realty and Freitas Lots schemes both involved kickbacks to the defendants in exchange for pressure on the City to grant leases. As the district court concluded, "[I]t was reasonable for the jury to infer that additional payments would be made in order to renew the lease[s]." The Pay-to-Get-Paid scheme presented the same danger: "[T]he City's habitual tardiness in paying its vendors, and the period of time over which Freitas made payments to expedite payment of his invoices, provided ample justification for the jury to conclude that such payments would continue to be made in the future."

Evidence concerning the Ise and Maggiocomo Jobs, both transpiring in 1996, was enough for the jury to conclude that these bribes were part of the same, continuous pattern that jobs in the City could be had for a price. The Freitas Lots, Freitas Lease, and Freitas Invoices schemes revolved around deals with Anthony Freitas, whose testimony revealed an especially active stage of the conspiracy in and 1998 and 1999.

There is no need to go into more detail. The evidence speaks more than enough to the conclusion that the jury could have found the requisite "pattern of racketeering activity" here.

D.    Conspiracy

Based on the same evidence, the jury could have found a conspiracy involving all three defendants.  We reiterate that RICO conspiracy does not require proof that a defendant "himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c)."  Salinas, 522 U.S. at 61-66.  Rather, he "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  Id. at 65.  We have noted that "[t]he conspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved."  United States v. Boylan, 898 F.2d 230, 241-42 (1st Cir. 1990).  The evidence, detailed above and throughout this opinion, amply fills this requirement.

As for Cianci, Ead's testimony placed Cianci at the head of the Ronci Estate, Ise Job, and Freitas Lots schemes.  Taped remarks by Corrente implicated Cianci in the Freitas Lease.  Corrente's position as Cianci's Director of Administration is itself circumstantial evidence of Cianci's conspiratorial involvement.

Corrente was implicated in at least five of the nine racketeering schemes.  He initiated the Tow List scheme and played

-31-

a major part in maintaining it throughout the duration of the conspiracy. Corrente received cash payments as part of the Jere Realty, Ronci Estate, Freitas Lease, and Pay-to-Get-Paid schemes.

Testimony by Kenneth Rocha, the chairman of the towers' association, revealed that Autiello was the point person for towers when it came time to make contributions to Cianci's political fund. Autiello took in the payments and reminded towers when their payments were due. As for Autiello's part in the Maggiocomo Job scheme, Mary Maggiacomo testified that she asked Autiello, who was in charge of maintenance of police cruisers, to help her son obtain a job on the City force. She delivered the $5,000 payment to him. When her son was ultimately denied admission into the police, Autiello refused to return the payment to Mrs. Maggiacomo.

E.     Special verdict

At the government's request, the district court submitted to the jury a special verdict form. Under the substantive RICO count (Count Two), the verdict form contained special interrogatories for each of the RICO predicates, listing them separately for each defendant. For each of the RICO predicates, the form asked the jury to check off "yes" or "no" to indicate whether the government had proven the predicate with respect to each defendant. As to Cianci, the jury returned the verdict form with "no" checked for every box (except one) indicating the government had not proven those racketeering acts. The one

unchecked box was for Act Ten (University Club); we offer no opinion on why the jury decided to leave it blank. For Corrente, the jury checked off "no" for all racketeering acts except Act Eight (Freitas Lease) and Act 9(a) ("Pay-to-Get-Paid"), for which the jury checked off "yes." For Autiello, the jury checked off "no" for all racketeering acts except Act Twelve (Maggiacomo job), which the jury concluded the government had proven. Ultimately, only Corrente was convicted on Count Two, substantive RICO, and all three defendants were found guilty on Count One, RICO conspiracy.

Defendants argue that the jury's responses to the interrogatories in the special verdict form under Count Two (the substantive RICO count) should bear on the verdict as to Count One (the RICO conspiracy). They claim that the jury's negative responses to these interrogatories indicate their rejection of the evidence proffered by the government for each of those offenses to which the jury responded "no." Defendants further contend that given the jury's specific findings, the evidence is insufficient to support the conspiracy verdict as a matter of law. They postulate that the specific purpose of the special verdict form is to limit the facts found at trial for the purpose of assessing on appeal the sufficiency of the prevailing party's case. Ordinarily, when a jury returns a general verdict of guilty on a substantive RICO count and one of the predicate acts is later found to be legally insufficient by a reviewing court, the conviction must be

overturned where it is impossible to determine whether two legally sufficient predicate acts support a RICO conviction.  See United States v. Holzer, 840 F.2d 1343, 1352 (7th Cir. 1988); United States v. Kragness, 830 F.2d 842, 861 (8th Cir. 1987).

The special verdict form allows juries to specifically identify the predicates for the general verdict.  In United States v. Torres Lopez, 851 F.2d 520 (1st Cir. 1988), we reversed a substantive RICO conviction where the jury's responses to interrogatories on a special verdict form properly related to the substantive conviction revealed that the government proved only time-barred predicates.  The defendants in that case argued that as indicated by the special verdict, the jury found them guilty of only two predicates.  When both of those predicates were shown to be outside the statute of limitations, we overturned the substantive RICO conviction.  Other circuits have employed the special verdict form similarly.  See United States v. Edwards, 303 F.3d 606 (5th Cir. 2002) (court used special verdict to uphold RICO conviction as being based on two valid predicates); United States v. Kramer, 73 F.3d 1067 (11th Cir. 1996) (money laundering conviction cannot stand where special verdict established defendant involvement in only foreign transactions).

The government counters that defendants' argument fails under the doctrine articulated by the Supreme Court in Dunn v. United States, 284 U.S. 390 (1932) and United States v. Powell, 469

U.S. 57 (1984).  In both cases, the Court held that acquittals on certain counts of an indictment play no role in the analysis of whether there is sufficient evidence supporting the surviving counts.  Powell, 469 U.S. at 64-69; Dunn, 284 U.S. at 392-94; see also United States v. Alicea, 205 F.3d 480 (1st Cir. 2000).  The reasoning is that a jury's decision to acquit on a particular count or counts may well be the product of "mistake, compromise, and lenity" and "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."[10]  Powell, 469 U.S. at 65-67.  The Court was concerned with the impracticality of a rule that would allow defendants to challenge inconsistent verdicts where such a challenge was speculative or would require inquiries into the jury's deliberations.  See id. at 68.

The defendants claim that neither Powell nor Dunn undermines the purpose and viability of special verdict forms in defining the universe of resolved facts.  They assert that in this case, we should exempt from our sufficiency review those pieces of evidence that have "been conclusively contradicted[.]" Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).  In reviewing a

---

[10]This rationale applies more directly to defendants' other argument that the jury's acquittals on the substantive, non-RICO counts should influence our review of the sufficiency of the evidence on the RICO conspiracy count.

criminal conviction for sufficiency, we do not assess the credibility of the witnesses, "which is the sole function of the trier of fact." Burks v. United States, 437 U.S. 1, 16 (1978); Torres Lopez, 851 F.2d at 527.

We have been steadfast with Powell and have repeatedly refused to carve out exceptions to the rule. United States v. Bucavalas, 909 F.2d 593, 595-97 (1st Cir. 1990) (adhering to Powell rule in affirming bribery conspiracy conviction of defendant, where jury acquitted all of the charged conspirators except defendant); Alicea, 205 F.3d at 484 ("[I]n a single, multi-count trial, acquittal on one or more counts does not preclude conviction on other counts based upon the same evidence, as long as that evidence is legally sufficient to support a finding of guilt on the count(s) of conviction."); see also United States v. Richard, 234 F.3d 763, 768 (1st Cir. 2000); United States v. Hernandez, 146 F.3d 30, 33 (1st Cir. 1998); United States v. Crochiere, 129 F.3d 233, 239 (1st Cir. 1997).

We are similarly hard pressed to make an exception here. The RICO conspiracy count and substantive RICO count are separate. The list of racketeering acts to which the jury answered interrogatories is part of the substantive RICO count only. The government requested the form so that if the jury did convict on substantive RICO, the conviction would be buttressed by express jury findings as to the two-predicate requirement. The jury

appears to have understood the two-predicate requirement, in that it checked off two predicates (extortion conspiracies for the Freitas Lease and "Pay-to-Get-Paid" schemes) for Corrente, who was the only defendant convicted on the substantive RICO count. No predicates were checked off for Cianci, and only one (bribery conspiracy in connection with the Maggiacomo Job) was found proven for Autiello; hence, neither was convicted of substantive RICO.

The "separate-ness" of the counts in the indictment, however, is not the central point of contention in this issue. Powell, 469 U.S. at 64. Defendants concede that "a person may be convicted of RICO conspiracy and acquitted of all substantive acts." (emphasis added). If proof of the requisite criminal agreement exists, "whether or not the substantive crime ensues" is irrelevant. Salinas, 522 U.S. at 65. Hence, the jury did not go out-of-bounds by convicting on the RICO conspiracy count while concluding the government failed to prove certain predicate racketeering acts underlying the substantive RICO count. See United States v. Weiner, 3 F.3d 17, 22 (1st Cir. 1993) ("[D]espite the dismissal of the separate [substantive] counts, the jury was entitled to consider the evidence [underlying those substantive counts] in support of the RICO counts").

Most instructive is United States v. Connolly, 341 F.3d 16 (1st Cir. 2003), where we upheld a substantive RICO and RICO conspiracy conviction. The defendant contended that the

government's failure to prove an "enterprise" was evidenced by the jury's finding that nine of fourteen racketeering acts listed in the indictment had not been proven beyond a reasonable doubt. Specifically, the defendant argued that the evidence did not establish that the charged enterprise was "continuous" or "ongoing." We stated that

> simply because the jury found a specified racketeering act as "unproven beyond a reasonable doubt" does not mean that the jury found the evidence relating to that act unpersuasive, in combination with other evidence in the case, on the existence of an association-in-fact enterprise. Rather, it may only mean that the government did not prove a requisite element of the underlying crime alleged as a racketeering act. . . . In returning a finding of "unproven," the jury could have concluded that the evidence underlying a [particular racketeering act], while failing to [prove all the elements of the crime committed by the act], nevertheless demonstrated a corrupt gratuity evidencing the existence of an illegal enterprise.

Id. at 26-27. The evidence relating to those acts that were found "unproven" by the jury was still available to the jury in its evaluation of the overall RICO charge. "That being so, the inquiry on appeal is whether the jury, in light of the totality of the evidence, was presented with sufficient evidence of "continuity" to support a conviction." Id. at 27. The jury verdict may be a compromise reflecting evil preparations by all three defendants but some doubt about implementation by Cianci and Autiello. In other words, though the evidence might not have shown completed

-38-

commission of the racketeering acts, it could have led the jury to find the requisites of a RICO <u>conspiracy</u> among the defendants to commit the racketeering acts.

F.    Amendment and variance

Defendants claim that the district court was only able to deny their dismissal motions by constructively amending the indictment. They point to the court's statement, in denying these motions, that "it seems to the Court that the indictment alleges that what the Defendants are accused of doing is having conducted the affairs of the City through a pattern of racketeering activity." Defendants also claim that post-trial, the district court erroneously concluded that the indictment could have alleged that the City was an innocent, unwitting participant in the criminal enterprise. This, defendants contend, conflicts with how they understood the indictment--that the City was a culpable participant in the RICO enterprise--and hence constituted a constructive amendment of the indictment.

An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or the court after the grand jury has returned the indictment. <u>United States</u> v. <u>Dubon-Otero</u>, 292 F.3d 1 (1st Cir. 2002). Amending the indictment is considered prejudicial <u>per se</u> and thus demands reversal. <u>Id.</u> at 4. The government argues that regardless of the alleged disparity between the indictment and the

trial judge's characterization thereof, there was no constructive amendment where the court instructed the jury "on the theory as charged." Indeed, the court specifically instructed, without objection from either party, that "the Government must prove that the Defendant[s] knowingly and willfully joined the conspiracy with knowledge of its unlawful purpose and with the intent that the purpose would be accomplished."

We find defendants' claimed understanding of the illicit-purpose RICO enterprise charged in the indictment to be both inaccurate and disingenuous. The indictment does not compel a reading that the City itself (or its constituent agencies) had to be found criminally culpable, as we explain in more detail supra. Defendants allude to United States v. Weissman, 899 F.2d 1111, 1115 (11th Cir. 1990), where the Eleventh Circuit held that the district court's jury charge "in effect altered an essential element of the crime charged" in the indictment. Here, the charge was taken largely from the indictment. No intimations by the court recast the "essential" elements of RICO outlined in the indictment. At no point, pre-trial or post-trial, did the district court transform the charged association-in-fact enterprise into a legal-purpose or legal-entity enterprise. The court's descriptions of the enterprise were in accord with the breadth of the enterprise charged in the indictment and the breadth the Supreme Court has assigned to RICO overall.

Alternatively, defendants contend that disparities between the indictment and the evidence resulted in a prejudicial variance. "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." United States v. Villarman-Oviedo, 325 F.3d 1, 12 (1st Cir. 2003) (internal quotation marks omitted). A variance requires reversal only when it is "both material and prejudicial, for example, if the variance works a substantial interference with the defendant's right to be informed of the charges laid at his doorstep." Id. (internal quotations marks omitted).

First, we reiterate that the jury's acquittals on the substantive counts and negative decisions on the racketeering acts listed under Count Two do not make the evidence underlying those counts and acts irrelevant to the RICO conspiracy count. Second, we repeat that the evidence as a whole, viewed in the light most favorable to the verdict, is sufficient as to the RICO conspiracy convictions for all three defendants. Accordingly, defendants' reliance on United States v. Morales, 185 F.3d 74 (2d Cir. 1999) (reversing RICO convictions where evidence established that defendants had all been incarcerated early in the period of racketeering activity alleged in the indictment), is misplaced. The evidence at trial, covering acts that occurred from 1991 to 1999 as charged in the indictment, tracked and satisfied the RICO elements and factual allegations contained in the indictment.

G.   "Associate" Liability

Autiello, and Corrente by adoption, argues that the court's instructions on "associate" liability under RICO failed to comply with the standard set out by the Supreme Court in Reves v. Ernst & Young, 507 U.S. 170 (1993).  The Court in Reves created the "operation management" test for determining RICO "associate" liability.  In order to have taken part in, or associated with the conduct of an enterprise, an "associate" must have had some part in directing those affairs of the enterprise.  Id. at 177-78.  The Court also stated that "an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management."  Id. at 184.  The Court further elucidated:

> Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

Id. at 179.

Autiello and Corrente argue that the district court "watered down" the government's burden of proof in its jury

instruction on "associate" RICO liability.[11]  Specifically, they claim that the instructions permitted conviction for performing acts without control over some part of the "direction" of the enterprise.

We find no merit in defendants' objection.  The instructions did not misstate the law; in fact, they reflected <u>Reves</u> nearly verbatim.  Defendants argue that the buzz word on "associate" liability is that an associate "direct" or be "integral" to the affairs of the enterprise.  The crucial words, however, are "operation and management," which effectively

---

[11]The court instructed, in relevant part:
"I told you that the Government has to prove that a Defendant is employed by or associated with an enterprise.  A person is considered to be associated with an enterprise if he or she knowingly participates directly or indirectly in the conduct of the enterprise's affairs or business.
A person doesn't have to have a formal relationship with or an official position in an enterprise in order to be associated with that enterprise.
Association may include an informal relationship or agreement between a person and an enterprise.  A person also may be associated with an enterprise even though his or her role is a relatively minor role, just as the case with respect to conspiracy. . . . In order to establish that Defendant conducted or participated directly or indirectly in the conduct of an enterprise's affairs, the Government must prove that the Defendant played some part in the operation or management of the enterprise.
Conducting or participating in the conduct of an enterprise's affairs includes things like performing acts, function or duties which are related to the operation of the enterprise.  The Government doesn't have to prove that a Defendant exercised significant control over or within the enterprise, and the Government doesn't have to prove that the Defendant was an upper echelon member of the enterprise.
An enterprise is operated not only upper management but also by lower rung participants who work under the direction of the managers of the enterprise."

communicate to a jury that in order for a defendant to have been an associate of the RICO enterprise, his participation needs to have had "an element of direction" of the enterprise's affairs. Id. at 178; United States v. Marino, 277 F.3d 11, 33 (1st Cir.), cert. denied, 536 U.S. 948 (2002); United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994). The court more than sufficiently accounted for this requirement by instructing that the defendant must have "played some part in the operation or management of the enterprise."

In general, we have fashioned the Reves "operation or management" test in accordance with the breadth with which we must construe RICO:

> The requirement of association with the enterprise is not strict. The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. The RICO statute seeks to encompass people who are merely associated with the enterprise. The defendant need only be aware of at least the general existence of the enterprise named in the indictment, and know about its related activities.

Marino, 277 F.3d at 33 (citations and internal quotations omitted). Hence, as an evidentiary matter, the government presented more than enough to establish that, if there was an enterprise, the two, at various times, played important roles in the direction and supervision of the enterprise's operations. Neither was merely "peripherally involved with the enterprise." The direct testimony of Kenneth Rocha demonstrated that not only was Autiello aware of

the general existence of the enterprise, but that he was central to furthering the goals of the enterprise, specifically as the collection agent for Corrente in obtaining payments from the Tow List members.  His participation in the Maggiacomo Job scheme again evinced his awareness of the general enterprise as well as his direct involvement in the direction and management of the enterprise.  As for Corrente, we need not rehash the evidence that amply establishes his role in the enterprise.  The fact that he was Cianci's right-hand man, in addition to evidence specifically showing his directorial or supervisory involvement in individual racketeering acts, puts him in the heartland of "associate" RICO liability as set out in Reves.

## II.    The Joint Federal Bribery Conspiracy Convictions (Corrente and Autiello)

In relevant part, the federal bribery statute provides:

> **(a)** Whoever, if the circumstance described in subsection (b) of this section exists--
>
> **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
>
> *    *    *
>
> **(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization,

government or agency involving any thing of value of $5000 or more. . .

* * *

shall be fined under this title, imprisoned not more than 10 years, or both.

**(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(a)(1)(B). Corrente and Autiello were convicted of conspiring to violate this statute, see 18 U.S.C. § 371, for their roles in the Tow List scheme. The government's theory was that, in requiring "campaign contributions" from those who wished to remain on the police department's tow list, Corrente (in cahoots with Autiello, who acted as the towers' agent) acted as an "agent" of the police department within the meaning of subsection (a)(1). The department qualified as an "agency" under subsection (b) because it received an average of about $1 million in federal aid annually (and never less than $10,000) between 1991 and 1999. A portion of that aid (conferred in connection with a federal anti-domestic violence program) was used in and around 1996 (1) to train dispatchers for the police unit that, among their other duties, called companies on the City's tow list when towing was needed, and

-46-

(2) to purchase the communications and computer equipment used by the dispatchers who made these calls.

Corrente and Autiello argue that their convictions cannot stand because there is insufficient evidence of a connection between their conduct and the federal funds received by the police department. The district court instructed the jury, without objection, that such a connection is required. The court described the connection (in relevant part) as follows: "[T]he Government must . . . prove that there is some connection between the alleged bribe and the federal funds received by the local government or agency . . . ." Corrente and Autiello contend that the "federal funds" evidence described in the preceding paragraph is patently inadequate to ground a finding that such a connection existed in this case.

The two concede that the statute itself does not require that the offense conduct have an effect on the federal funds. See Salinas, 522 U.S. at 61 ("[A]s a matter of statutory construction, § 666(a)(1)(B) does not require the Government to prove the bribe in question had any particular influence on federal funds . . . .") (emphasis supplied). They also acknowledge that, at the time of oral argument, a post-Salinas circuit split had emerged over whether, as a statutory and/or constitutional matter, some connection between the offense conduct and a federal interest (if not federal funds themselves) was required. Compare, e.g., United

-47-

States v. Zwick, 199 F.3d 672, 682-88 (3d Cir. 1999) (treating the statute as having been enacted under the Spending Clause and holding, in part because the Constitution requires that "legislation regulating behavior of entities receiving federal funds must . . . be based upon a federal interest in the particular conduct," (citing South Dakota v. Dole, 483 U.S. 203, 207 (1987)), that the statute requires the government to prove that a federal interest is implicated by the offense conduct), and United States v. Santopietro, 166 F.3d 88, 92-93 (2d Cir. 1999) (similar, endorsing the post-Salinas vitality of prior Second Circuit law interpreting the statute to require that the offense conduct threaten the integrity and proper operation of a federal program), with, e.g., United States v. Sabri, 326 F.3d 937, 940-53 (8th Cir. 2003) (no connection between the offense conduct and a case-specific federal interest is required by either the Constitution or the statute, which was lawfully enacted under the Necessary and Proper Clause and not the Spending Clause).

Unsurprisingly, Corrente and Autiello prefer the approach exemplified by Zwick and Santopietro. They emphasize that Salinas explicitly left open whether some connection between the offense conduct and a federal interest is required for the statute to be constitutionally applied. See 522 U.S. at 60-61 (declining to decide the broader constitutional issue because the statute was constitutionally applied on the case facts). They argue that

-48-

requiring a connection such as the one identified in <u>Zwick</u> and <u>Santopietro</u> is necessary to maintain an appropriate state-federal balance in a criminal law area that has been the traditional province of the states.

While these appeals were under advisement, the Supreme Court granted a writ of certiorari in <u>Sabri</u> and resolved the circuit split in favor of the position adopted by the Eighth Circuit. <u>See</u> <u>Sabri</u> v. <u>United States</u>, 124 S. Ct. 1941, 1945-49 (2004). If error can be "plain" within the meaning of Fed. R. Crim. P. 52(b) even if it only becomes so while the case in which it is raised is on appeal, <u>see</u> <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461, 467-68 (1997), we see no reason why it should not also be "patent" for purposes of applying the <u>Zanghi</u> principle, <u>see</u> 189 F.3d at 79-80, discussed and applied <u>supra</u> at 18-19. Because application of <u>Zanghi</u> requires that we disregard the nexus instruction upon which Corrente and Autiello base their sufficiency challenges to their joint federal bribery conspiracy convictions, we must reject those challenges.